An order may be submitted in accordance with this opinion.

### THE H. S. NO. 60.

### STEERS SAND & GRAVEL CORPORATION v. WIGTON–ABBOTT CORPORATION et al.

### No. A–16559.

District Court, E. D. New York.

Nov. 23, 1943.

Purdy & Lamb, of New York City (Edmund F. Lamb and Thomas J. Irving, both of New York City, of counsel), for libelant.

Alexander & Ash, of New York City (Joseph M. Meehan, of New York City, of counsel), for respondents.

BYERS, District Judge.

This cause in personam was instituted to recover damages to the sand scow H.S. No. 60, said to have been caused by the negligent manner in which her cargo of gravel was discharged at the Bayonne Terminal on December 21, 1941.

The vessel is 91 feet long by 31 feet, 6 inches in beam, and her depth is undisclosed. The uncontradicted testimony is that she was about 35 years old at the time in question; it sufficiently appears that these years had taken their toll of the craft, and since the survey discloses estimated cost of repairs to be $3,577 and the libel seeks recovery of $5,000 it is obvious that the alleged negligence, if established, could be turned into a financially satisfactory transaction.

The negligence complained of is in the manner of the discharge; that is 553 cubic yards of gravel is said to have been removed according to so irregular a plan of progress that the starboard bow and the port stern of the scow were left with their original weight of cargo, while the rest was being discharged, and that at those diagonally opposite extremities the vessel was bent down so as to twist the hull; that is, the port side aft was 15 inches, and the starboard side forward was 12 inches, below the waterline level.

It is not in dispute that such a condition did exist when discharge had been completed on the night of the 21st or in the morning of the 22d, but there is controversy as to whether it was present when the scow arrived with her cargo. As to that, the bargee is quite clear that his hull was not out of shape in any degree, when discharge was started, while the respondents' crane operator and one witness who inspected the vessel, prior to and after the operation had been completed, testify the other way.

At best, the evidence is unsatisfactory on both sides, and while the issue of negligence is clear enough, the resolution of the doubt created by both narratives is a reluctant and labored process, and yields the view that the twist did occur during the discharge, but that it was as much attributable to the weakness of the interior structure of the hull as to the pattern followed in removing the gravel; also that any departure from conventional methods was instigated by the bargee himself, who probably suspected the frailties of his senescent charge.

The H.S. No. 60 was moored with her starboard side to the unloading pier around 9 a.m. on Sunday, December 21, 1941, having been delivered on the previous day alongside two other loaded scows.

There was an inspection made on the 20th by a representative of respondents, named Uzdilla, not now so employed.

He produced his note-book (Lib.Ex.3) which indicates a careful checking of the deck at over forty places. At the foot of the sheet appears the following: "Loose X Bracing thruout. Scow skewed starboard, forward, and port side aft. Two Tie Rods rotted."

The date has been changed by erasure at the top of the sheet from 12/20/41 to 12/21/41. That could of course have been done at the time, but no such explanation (i.e., of erasure and writing over it) was offered. The quoted words could have been written immediately after the inspection was made, and the witness testified that such was the fact. If that were true, a like expression would occur in the written report made up in the office by a boy to whom the book was handed for that purpose. The written report dated December 21, 1941 (Resp.Ex.B) is assumed to contain the same figures as to checking as the pages from the book, and at the foot, the following:

"All X bracing throughout loose and slapping; two tie rods rotted through and broken loose; inside of scow very slimey bottom, sides as well as all bracing and timber. Entered at the stern end which had 14 inches of water in the bottom. Outside was worm eaten quite extensively, and a lot of short pieces in her side.
"Jules Uzdilla, Surveyor".

Since no original entry forms the basis of this footnote, the latter must have been explained or dictated when the note-book was delivered, at which time the skew or twist was not referred to. This variation between the two records justifies the

inference that the words first quoted from the note-book were added after the report had been written in the office. On the other hand, the report itself is accepted as to the observations made concerning the loose bracing and the broken tie rods.

Further light is cast upon the subject by Uzdilla's testimony that he inspected the scow when light, he says on the 22d, because he knew the receiving department had asked the scow's captain to sign a release when discharge had been completed, and that he had refused, claiming that his vessel had been damaged.

It would have been consistent with his employer's interest for Uzdilla to make the entry in his note-book at that second inspection, concerning the presence of the twist in the scow at arrival.

In view of these circumstances, I cannot accept Uzdilla's testimony as establishing that asserted fact.

If he had indeed observed so pronounced a twist, I should suppose that, in addition to making a note of it, he would have called it emphatically to the attention of some one in authority, so as to establish the fact so clearly that no successful claim could later be made because of it. That was his job.

Vitale, the crane operator, said that he observed the twist when he began removing the gravel by the customary use of a bucket swung from his revolving crane. He was a satisfactory witness generally, but it was no particular concern of his whether the scow was more out of shape than such vessels are customarily, and it was easy for him to say that it was, without consciously stretching his conscience. His testimony on the subject is not deemed sufficient to sustain a finding that the twist of 12 inches forward and 15 inches aft was present when unloading began, particularly as his statement made two days later (Lib. Ex.4) makes no reference to that condition.

As to the method pursued to accomplish discharge, there are but two versions, that of Tersen, the bargee, and that of Vitale, the crane operator. They agree in this, that Tersen made a request that something special be done, after the operation had been under way for about an hour, and that the request was acceded to; also they agree that gravel was first taken from amidships, starboard side. Tersen says that the path of progress was across to port, in a diagonal direction toward the port bow; this, he says, caused the scow to list to port

(the opposite tendency would seem to have been the natural one, although perhaps he means that the scow was down by the port stern then), which caused her pump in the starboard stern to cease functioning since it does not reach below a 2-inch level in the bottom of the hold.

Tersen had started his pump about 9:30 a.m. or about a half hour after unloading began, in order to clear the hull of water which he said had seeped through the gravel which was wet when taken on. At the end of about ten minutes, the pumping effort failed as stated.

Vitale agrees that the bargee called his attention to the list, and said that there was so much water below that the scow must be trimmed, for there would be danger otherwise, as the depth of water then in the hold was 14 inches.

Since the witnesses agree to so much, it is necessary to find that the testimony shows that about one hour after the discharge had started the scow had a port list aft. This means that by then more gravel had been lifted from the starboard than from the port side.

Tersen says he asked Vitale to straighten the boat up again, and that the latter "said that he could not do it because he had no place to put the material, no trucks".

It is necessary to pause to explain that Tersen repeatedly and clearly testified that the buckets were dumped directly into trucks that drew up near the crane for that purpose, and that such was the course of unloading during the whole day.

I am satisfied by the preponderance of credible testimony that he is mistaken as to this, and that the fact is that the gravel was continuously dumped on or near the pier on a stock pile or piles, and that trucks did not receive this gravel directly from the buckets, and I so find.

It is not held that Tersen painstakingly lied, for perhaps he has convinced himself that trucks were probably present and, if so, there would be a reason why the discharge would be held up if they were delayed in arrival from time to time.

Vitale would have no reason to refuse to lighten the starboard side so as to trim the scow, for any such cause as Tersen states. Vitale said he was requested "to cast the gravel from one starboard side to the starboard stern, being that the port stern was low and his pump would not take water. I told him that was not the right

way to unload it but he insisted on it * * *. I asked our shop steward and he insisted to him also that is what he wanted * * * and said the scow would probably sink. It had about 14 inches of water in it."

That the shop steward "told me that the best thing to do, if the captain says he is fearful of sinking, you may as well get it out."

Further, that he cast 100 yards or more (1½ yards to a bucket) on the starboard stern, which he had taken from the starboard bow.

This required about an hour, and to that extent arrested the discharge, and increased its cost. Tersen says it straightened the boat up. By 4 p.m. when Vitale quit, three-quarters of the cargo had been unloaded, and the balance was taken by another operator who worked the night shift. Whether the job was completed that night, or early the following morning is left in doubt, although Tersen's story is to the latter effect. When he turned in at 10–11 p.m. on the 21st the unloading was still in progress.

No finding is deemed necessary as to that detail, because it is the manner of discharge rather than the hour of completion which is important.

Tersen says that the gravel was so removed by following a generally diagonal course from port bow to starboard stern, and that the starboard bow and the port stern were the last to be cleared. At least his testimony comes down to that; while Vitale says that, after he had cast the 100 yards on the starboard stern, he worked over the entire load uniformly from the then top, fore and aft, from amidships, so as to maintain a trim.

Probably this was not done with precision, particularly as nothing is disclosed as to the lighting facilities which were employed during the late afternoon and evening of the shortest day in 1941. Tersen does not testify that he watched the operation as it proceeded during those hours, nor was he clear or convincing as to what actually took place after his request in the morning to heap up gravel on the starboard stern.

In the morning of the 22d there was an awareness by respondents that a controversy might be in the making, for Tersen was asked to sign a release, and refused to do so; in this he was upheld by his superior, speaking on the telephone. That was Tersen's preoccupation on the 22d, and so he may be mistaken as to the completion of discharge during those morning hours. His testimony is clear that it was then that he discovered the twist, because it was almost impossible to open the door of his cabin, due to the sagging of the deck at the port stern. That is a likely narrative and is accepted as to so pronounced a twist as that shown by the figures stated.

It will be seen that the narrow issue is really whether the load was taken off evenly as Vitale said it should have been, or in such a way as to leave substantial parts of the cargo at diagonally opposite ends for the last removal, with the result that those ends, starboard bow and port stern, bent down, and produced the twist of the dimensions shown, when all gravel had been cleared.

The proper maintenance of trim during discharge is thought to be the duty of the stevedore, of the same order as the preserving of proper trim in stowage, and as to the latter the cases are clear: S.C. L. No. 9, 3 Cir., 114 F.2d 964, 1940 A.M.C. 1355; Hastorf Contracting Co. v. Ocean Transp. Corp., D.C., 4 F.2d 583, among others.

The libelant has undertaken to establish that the trim of this scow was not maintained by the respondents whose duty was the same as that of a stevedore, and its testimony is persuasive that there was a greater twist at the end of the discharge than when the scow arrived. It is a fair inference that the twist would not have resulted, if the load of gravel had been evenly removed. It is more than an inference, however, that the under-deck conditions of the scow, namely, the two broken tie rods and the loose and slapping crossbracing, were such that even a moderate strain on the hull produced by unevenly distributed weight of gravel on the deck during discharge would cause a twist in the entire structure which would not have been the case in a well found vessel.

It seems to me that in the case of such a scow as this the libelant rested under the necessity of clearly demonstrating that discharge was so irregular in its progress because of the respondents' (stevedore's) negligence, that it is fairly entitled to recover the damages it seeks.

Sight has not been lost of the cases which hold that the stevedore is not relieved of his duty by reliance upon instructions

from the bargee. It is not intended to place this decision upon the ground that Tersen induced Vitale to interrupt the discharge so as to bring the starboard stern corner down to render the pump of service. That testimony was referred to by way of relating the actual happening, and to indicate that Tersen at that time was fearful of the effect of 14 inches of water in his hold, and felt that he could not wait until the list should be righted by the ordinary progress of the unloading operation.

Surely in discharging such a cargo there must be intervals when the trim is not perfect, and I should suppose that a sturdy, well found scow could withstand them. It is not found that this scow was unseaworthy, but that her age and infirmities were such as to place a burden of proof upon her owner which is more clear and convincing than has been shown in this cause. For failure of such proof, the libel is dismissed with costs.

Settle decree and findings if desired.